UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| James B. Jett, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:14-cv-00276 (APM) |
| | ) | |
| Federal Bureau of Investigation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

In 2012, Plaintiff James B. Jett was a candidate in the race to represent the 3rd Congressional District of Florida in the United States House of Representatives.  According to Jett, intermediaries of his opponent, who was a sitting Member of Congress, approached him during the campaign and offered him various benefits in exchange for dropping out of the race. Jett reported the offers to Defendant Federal Bureau of Investigation ("FBI"), which initiated an investigation into Jett's allegations.  As part of the investigation, Jett agreed to record telephone conversations with the intermediaries.  Local FBI agents also instructed Jett to wear a wire into a meeting with his opponent, the intermediaries, and another, high-ranking, Member of the United States House of Representatives.  But, according to Jett, officials at FBI headquarters called off the operation to protect the high-ranking Member.   Soon thereafter, the FBI closed its investigation.

Jett eventually lost the election.  He then filed a Freedom of Information Act ("FOIA") request with the FBI seeking records related to the investigation.  The FBI produced 66 pages of

investigative files, many of which contained redactions. Jett now claims that the FBI (1) did not conduct an adequate search in response to his request; (2) improperly redacted records under FOIA Exemptions 6, 7(C), and 7(E); and (3) improperly withheld duplicate records.

Before the court are the parties' respective motions for summary judgment. As explained below, both motions are granted in part and denied in part.

## II.    BACKGROUND

### A.    The FBI's Investigation into Jett's Allegations

In 2012, Plaintiff ran as a candidate to represent the 3rd Congressional District of Florida in the United States Congress. Def.'s Mot. for Summ. J., Ex. K, ECF No. 10-2, at 71. According to Jett, in February 2012, multiple intermediaries ("Intermediaries") of one of his opponents ("Opponent"), an incumbent Member of Congress, approached him with offers of future employment and reimbursement of campaign expenditures if he agreed to drop out of the race. *Id.* at 72. Jett reported these offers to the FBI, whose field office in Jacksonville, Florida, initiated an investigation. *Id.* at 71.

Much of what occurred during the short-lived investigation is revealed in the investigative files produced by the FBI to Jett. On March 1, 2012, the Jacksonville Field Office's agents asked Jett to make recorded phone calls with the Intermediaries, which Jett agreed to do. *Id.* at 74-91, 97. Based on those recorded calls, the Field Office agents sought approval from the Public Corruption Unit at FBI headquarters to have Jett wear a wire during a face-to-face meeting at which the Opponent, the Intermediaries, and a high-ranking Member of the House of Representatives would be present. *Id.* at 101. The Public Corruption Unit agents, however, rejected the request. Instead, they advised Jett that, before they would authorize him to wear a wire, he would have to record another conversation with the Intermediaries and declare

2

"unequivocally" that he was unwilling to drop out of the race. *Id.* When it produced the investigative file to Jett, the FBI redacted from it text that explained why the Public Corruption Unit agents refused to allow Jett to wear a wire unless he first made another recorded telephone call. *Id.*

The investigation came to a swift end, largely because of Jett's actions. Jett did not record another call, as the Public Corruption Unit agents had requested. *Id.* Instead, on March 2, 2012, Jett met face-to-face with the Opponent and his Intermediaries, though the high-ranking Member of the House of Representatives was not present. *Id.* at 92. Inexplicably, Jett told the Opponent and the Intermediaries that the FBI had approached him and had inquired whether anyone had offered him anything of value to drop out of the race. *Id.* He also told the Opponent that he would not accept any of the Opponent's offers and would not drop out of the race. *Id.* Unsurprisingly, the Opponent denied that he had authorized anyone to make any offer to Jett and even asked Jett whether he was wearing a wire. *Id.* The meeting then abruptly concluded. *Id.* Weeks later, on March 29, 2012, Jett publicly accused his Opponent of attempting to bribe him. *Id.* at 94.

On June 20, 2012, the FBI formally closed its investigation, citing as its reasons Jett's disclosure of the FBI's investigation to his Opponent and his public accusations of bribery. *Id.* at 104.

**B.      Jett's FOIA Request**

On December 26, 2012, Jett submitted a FOIA request to the FBI, seeking records pertaining to the FBI's investigation of his Opponent. Def.'s Mot. for Summ. J., Ex. A , at 25. In his request, Plaintiff stated:

> My name is 'James B. Jett' and I am requesting 'any' information you have available on an investigation originating within the Jacksonville, Florida Field Office regarding an incident involving [the Intermediaries], [the Opponent] and [the high-ranking House of Representatives Member].

3

*Id.* at 25.  Jett specified that he sought:

> FBI investigative reports, copies of telephonic tape recordings made from my personal telephone at the request of the FBI, interview reports of any individuals involved, follow-up investigative reports by any FBI agents and/or written transcriptions of 'any' recorded conversations between myself and the suspects involved in this case.

*Id.* Jett added: "Please search the FBI's indices to the Central Records System for the information responsive to this request." *Id.* The FBI confirmed via email on December 26, 2012, that it had received Plaintiff's request. Def.'s Statement of Material Facts, ECF No. 10-1, ¶ 9.

On January 14, 2013, the FBI sent two letters to Jett. *Id.* ¶¶ 10-11. The first informed him that his initial request lacked sufficient information to conduct an accurate search within the FBI's Central Records System ("CRS"). *Id.* ¶ 10. The second informed him that to obtain records about third parties he needed to submit a Privacy Act waiver signed by those individuals. *Id.* ¶ 11. Responding by letter on January 23, 2013, Jett clarified the scope of his request and reiterated his request for the records, arguing that the third-party waivers were unnecessary because the public interest outweighed concerns about the third-parties' privacy. *Id.* ¶ 12; Def.'s Mot. for Summ. J., Ex. E, at 43. He also renewed his request for "copies of any electronically recorded conversations between myself and the three suspects involved in this criminal case." Def.'s Mot. for Summ. J., Ex. E, at 43. On February 4, 2013, the FBI informed Jett that it had received his request and had begun to search for responsive records. *Id.*, Ex. F, at 46.

To identify responsive material, an FBI FOIA analyst searched CRS by using a "three-way phonetic breakdown" of Jett's name. Decl. of David M. Hardy, ECF 10-2, ¶ 22 [hereinafter "Hardy Decl."]. The analyst used no other search terms and searched no database other than CRS. The FBI's search turned up "one responsive FBI Jacksonville main file and two sub-files that were opened to investigate plaintiff's allegations." *Id.* Ultimately, the FBI identified 66 pages that were

responsive to Jett's request. *Id.* ¶¶ 12, 25.  Of those 66 pages, one page was produced in full;

59 pages were redacted in part; three pages were redacted in their entirety; and three pages were

withheld on the grounds that they were duplicative. *Id.* ¶ 25.  The FBI invoked FOIA Exemptions

6, 7(C), and 7(E) to justify its various redactions and withholdings. *Id.* ¶ 27.

After exhausting his administrative remedies, Plaintiff filed this action on February 21,

2014. Compl., ECF No. 1.

## III.   STANDARD OF REVIEW

Most FOIA cases are appropriately resolved on motions for summary judgment.

*Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  A court

must grant summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a

fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Unlike the review of other agency action that must be

upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly

places the burden 'on the agency to sustain its action' and directs the district courts to 'determine

the matter *de novo*.'" *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989)

(quoting 5 U.S.C. § 552(a)(4)(B)).

Summary judgment in a FOIA case may be based solely on information provided in an

agency's supporting affidavits or declarations if they are "relatively detailed and non-conclusory."

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations omitted) (internal

quotation marks omitted).  The agency's affidavits or declarations must "describe the documents

and the justifications for nondisclosure with reasonably specific detail [and] demonstrate that the

information withheld logically falls within the claimed exemption." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Further, they must not be "controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Id.*; *see Beltranena v. Clinton*, 770 F. Supp. 2d 175, 181-82 (D.D.C. 2011). "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. DOJ*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *DOJ v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

## IV.   DISCUSSION

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Because of FOIA's critical role in promoting transparency and accountability, "[a]t all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions, *see* 5 U.S.C. § 552(b); *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973). "Ultimately, an agency's justification for invoking a FOIA exemption is

sufficient if it appears logical or plausible." *Judicial Watch, Inc. v. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (citations omitted) (internal quotation marks omitted).

A court must determine *de novo* whether an agency properly withheld information and, to that end, may examine the withheld records *in camera.* 5 U.S.C. § 552(a)(4)(B); *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents are few in number and of short length, *in camera* review may save time and money." (citation omitted) (internal quotation marks omitted)). Here, the court exercised its discretion and ordered the FBI to submit all redacted and withheld pages for *in camera* review. Order, ECF No. 16. The court thus had the benefit of reading the material that Jett claims was improperly withheld.

### A.    Redactions of Responsive Records

#### 1.    Exemptions 6 and 7(C)

The court first considers Plaintiff's challenge to the FBI's invocation of FOIA Exemptions 6 and 7(C) to withhold and redact responsive material. Exemptions 6 and 7(C) protect the privacy of individuals whose names and other identifying information appear in agency files. Specifically, Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Although the FBI has invoked both exemptions, the court need only consider whether it properly invoked Exemption 7(C). *See ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011) (stating that "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material" (citations omitted)).

Because Plaintiff does not dispute that the responsive records withheld by Defendant constitute "law enforcement records," as specified in Exemption 7(C), Mem. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 12, at 10 n.6 [hereinafter "Pl.'s Mem."], the court's task is limited to balancing the pertinent public and private interests.

To determine whether the release of information would constitute an "unwarranted invasion of privacy" under Exemption 7(C), the court must balance "the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992) (citations omitted); *see also ACLU*, 655 F.3d at 6.   The Court of Appeals has recognized that individuals such as law enforcement personnel, witnesses, informants, and even "third parties who may be mentioned in investigatory files" have "an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation." *Nation Magazine, Wash. Bureau v U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) (citations omitted); *see also Abdeljabbar v. Bureau of Alcohol, Tobacco and Firearms*, 74 F. Supp. 3d 158, 179 (D.D.C. 2014) (citing cases from this court holding that information regarding law enforcement personnel was properly withheld under Exemption 7(C)).   Such individuals also have a "second, distinct privacy interest in the *contents* of the investigative files." *Citizens for Pub. Responsibility & Ethics in Wash. (CREW) v. DOJ*, 746 F.3d 1082, 1092 (D.C. Cir. 2014).   The public disclosure of law enforcement files has the potential to cause, at the very least, public embarrassment and humiliation, and possibly more severe consequences to reputational and pecuniary interests. *Id.*

To protect these substantial privacy interests, the Court of Appeals in *SafeCard* adopted a "categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is necessary in order to confirm or refute

compelling evidence that the agency is engaged in illegal activity." *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003) (citations omitted) (internal quotation marks omitted); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 999 (D.C. Cir. 1998) (describing the public interest as "insubstantial unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in illegal activity and shows that the information sought is necessary in order to confirm or refute that evidence" (citation omitted) (internal quotation marks omitted)).[1]

The FBI here invoked Exemption 7(C) to withhold the names and identifying information of, broadly speaking, two categories of individuals: third parties and law enforcement personnel. Plaintiff, however, has not come forward with any "compelling evidence that [the FBI] . . . engaged in illegal activity," *Schrecker*, 349 F.3d at 661 (citations omitted) (internal quotation marks omitted), to overcome the strong privacy interests of those named in the FBI's files. Thus, under *SafeCard*, the court finds that the FBI's invocation of Exemption 7(C) was proper.

Plaintiff contends that "[t]here is clearly a significant and compelling public interest in understanding the agency's investigatory actions in response to the evidence of [there] being political bribery . . . and [in understanding the] basis for the FBI's instructions requiring inaction presented to the local FBI [field] investigators." Pl.'s Mem. at 13. Maybe so. But, absent "compelling evidence" of "illegal activity," those public interests do not outweigh the strong individual privacy interests enshrined in Exemption 7(C). *Schrecker*, 349 F.3d at 661 (citations omitted) (internal quotation marks omitted).

Plaintiff's reliance on *CREW*—a case involving a FOIA request for FBI records of its investigation of Tom DeLay, the former Majority Leader of the House of Representatives, arising

---

[1] The fact that some of the third parties mentioned in the FBI's files are public officials does not substantially lessen the privacy interest at stake. Although public officials "may have a somewhat diminished privacy interest," they "do not surrender all rights to personal privacy when they accept a public appointment." *CREW*, 746 F.3d at 1092 (citations omitted) (internal quotation marks omitted).

from the activities of lobbyist Jack Abramoff—is misplaced.  746 F.3d at 1088.  There, the Court of Appeals held that there was a "weighty" public interest in "shining a light on the FBI's investigation of major political corruption and the DOJ's ultimate decision not to prosecute a prominent member of the Congress for any involvement he may have had."  *Id.* at 1092-93. Because the records at issue in *CREW* related to "a wide-ranging public corruption investigation as part of [the FBI's] ongoing efforts to root out systemic corruption within the highest levels of government," the Court concluded that "[d]isclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches."  *Id.* at 1093.

But *CREW* did not hold that FOIA required that Tom DeLay's or anyone else's name or private information contained in the investigative files be revealed in unredacted form.  Rather, it held that, in light of the significant public interests at stake, the agency's categorical withholding of *all responsive records* under Exemption 7(C) was improper.  *Id.* at 1096.  The Court of Appeals thus remanded the case for the district court to weigh what information may be withheld under Exemption 7(C)'s balancing test and whether any information was reasonably segregable and could be disclosed.  *Id.*  In doing so, the Court acknowledged that "it is likely that some of the requested information ultimately will be exempt from disclosure," *id.* (citation omitted), such as the "names and identifying information of third parties contained in investigative files," which are "presumptively exempt."  *Id.* (citing *Schrecker*, 349 F.3d at 666; *SafeCard*, 926 F.2d at 1206).

In contrast to *CREW* (and, perhaps, because of *CREW*), the FBI in this case did not categorically withhold all responsive records; rather, it conducted a line-by-line review of the records and invoked Exemption 7(C), with one exception discussed below, only to redact names and other identifying information of third parties.  That approach is consistent with *CREW* and this

Circuit's "long line of FOIA cases holding that disclosure of the *identities* of private citizens mentioned in law enforcement files constitutes an unwarranted invasion of privacy." *Nation Magazine*, 71 F.3d at 896.  Thus, the court finds that revealing the names and other identifying information of these individuals would "occasion an invasion of" their privacy "disproportionate to, and therefore unwarranted by, such insight as the public would gain into what the Government is up to." *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998) (citation omitted) (internal quotation marks omitted) (holding that even though the public official had diminished his public interest by making statements to the press, he retained a privacy interest in "avoiding disclosure of the details of the investigation, of his misconduct, and of his punishment . . . and perhaps . . . in preventing hitherto speculative press reports of his misconduct from receiving authoritative confirmation from an official source").

The FBI did, in one instance here, invoke Exemption 7(C) to justify withholding three pages in their entirety, all of which pertain to the high-ranking Member of the House of Representative's travel itinerary to Florida.  Def.'s Mot. for Summ. J., Ex. K, at 70.  The court has reviewed those three pages *in camera* and agrees with the FBI that the Member's privacy interests outweigh the "citizens' right to be informed about what their government is up to." *Davis*, 968 F.2d at 1282 (citations omitted) (internal quotation marks omitted).  Thus, the FBI's withholding of those pages was proper.

### 2.    *Exemption 7(E)*

Exemption 7(E) allows an agency to withhold information compiled for law enforcement purposes if its release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or

prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

5 U.S.C. § 552(b)(7)(E).  As the Court of Appeals explained in *Mayer Brown LLP v. IRS*:

> Exemption 7(E) clearly protects information that would *train* potential violators to evade the law or *instruct* them how to break the law.  But it goes further.  It exempts from disclosure information that could *increase the risks* that a law will be violated or that past violators will escape legal consequences.

562 F.3d 1190, 1193 (D.C. Cir. 2009).  "Rather than requiring a highly specific burden of showing how the law will be circumvented," the exemption only requires an agency to "demonstrate . . . logically how the release of the requested information might create a risk of circumvention of the law."  *Id.* at 1194 (quoting *PHE, Inc. v. DOJ*, 983 F.2d 248, 251 (D.C. Cir. 1993)) (internal quotation marks omitted).  In other words, "Exemption 7(E)'s requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify withholding.'"  *Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.— Mexico*, 740 F.3d 195, 204-05 (D.C. Cir. 2014) (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)).

Here, the FBI asserted Exemption 7(E) to protect two types of information.  First, the FBI claims that Exemption 7(E) applies to information concerning "the nature and timing of the FBI investigation pursued by the FBI in the subject records"; specifically, "the type of investigation it pursued and how it transitioned through the specific stages of its investigation."  Hardy Decl. ¶ 47.  The FBI is concerned that if such information is made public it would provide "valuable insight into how the FBI develops its investigations and whether or when the FBI may act on the information it has gathered," making "it easier for criminals to time and structure their illegal activities accordingly in order to circumvent the FBI's attempts to enforce the law."  *Id.*  Second, the FBI asserts that Exemption 7(E) was used appropriately to protect "sensitive investigative strategies employed in order to investigate plaintiff's allegations of criminal misconduct" because

"[r]evealing these strategies would reveal how and when the FBI chooses to utilize certain investigative techniques in response to particular investigative circumstances." *Id.* ¶ 48. This in turn would make it easier for criminals "to predict and avoid the FBI's attempts to detect and/or disrupt their criminal activities." *Id.*

The court agrees with Plaintiff that, on its own, the Hardy Declaration fails to meet even the relatively low bar required to justify withholding under Exemption 7(E). The Hardy Declaration lacks any case-specific, meaningful explanation as to how any particular technique, procedure or guideline at issue *in this case* would make it easier for individuals to evade the law. *See CREW*, 746 F.3d at 1102 ("Although Exemption 7(E) sets a low bar for the agency to justify withholding . . . the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." (citations omitted) (internal quotation marks omitted)). Indeed, the declaration merely recites familiar incantations such as "[r]evealing [the FBI's] strategies would reveal how and when the FBI chooses to utilize certain investigative techniques"; "[r]elease of this information would describe to criminals which investigative techniques they would most likely need to avoid"; release "would allow them to predict and avoid the FBI's attempts to detect and/or disrupt their criminal activities"; and "[a]rmed with this information, criminals may be emboldened to pursue criminal action." Hardy Decl. ¶ 48. None of these formulaic statements provide any edification about why the specific redacted portions of the documents withheld from Jett might interfere with law enforcement in future public corruption investigations or provide an advantage to the subjects of such investigations.

Notwithstanding the inadequacy of the Hardy Declaration, the court nevertheless finds, based on its own *in camera* review of the material at issue, that the FBI properly invoked

Exemption 7(E).[2] 

      With the benefit of an *in camera* review, the court can conceive of at least two reasons why disclosure of the redacted information "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

---

[2] Although the agency bears the burden of proving that the records were properly withheld and must provide materials to allow "the court to critically evaluate the merit of the agency's claim of privilege," those materials "may take any form as long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *Delaney, Migdall & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C. Cir. 1987). *See also Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir. 1994) (stating that whether evidence provided by the government to justify withholding requested information comes "in the form of an *in camera* review of the actual documents, something labelled a Vaughn Index, a detailed affidavit, or oral testimony cannot be decisive" (citation omitted) (internal quotation marks omitted)).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

Without the benefit of full access to the documents, Plaintiff argues that the FBI's invocation of Exemption 7(E) was improper here because "well known investigation techniques and procedures described or depicted in movies, popular novels," etc., such as "wiretapping[ ] and surreptitious tape recordings" cannot be withheld under Exemption 7(E). Pl.'s Mem. at 16 (internal quotation marks omitted) (quoting *Albuquerque Publ'g Co. v. DOJ*, 726 F. Supp. 851, 858 (D.D.C. 1989)). But, as discussed above, the redactions here do not concern the methods or techniques of surreptitious recording; rather, they relate to how the FBI directed the investigation and why it instructed Jett not to wear a wire. Because the disclosure of that information poses a risk to future law enforcement activities, it was properly withheld under Exemption 7(E).

   *3. Segregability*

FOIA requires the FBI to disclose "[a]ny reasonably segregable portion of a record . . . after deletion of the portions [of the record] which are exempt." 5 U.S.C. § 552(b). This means that all "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Having conducted an *in camera* inspection of the withheld portions,

---

[3] Other redacted material, in the court's view, poses less risk of circumventing the law, because it ████████████████████ ████████████████████ *See* Def.'s Mot. for Summ. J., Ex. K, at 65. But given the "low bar" for invocation of Exemption 7(E), the court finds the redactions were proper, because disclosure of such information might aid persons intent on breaking the law in the future to know the type of conduct that will draw law enforcement scrutiny.

the court finds that the FBI properly disclosed the reasonably segregable, nonexempt portions of the responsive records.

### B.      Withholding of "Duplicative" Records

Next, Jett argues that the FBI improperly withheld three pages of duplicative records. He contends that such withholding was improper because FOIA permits agencies to decline production only if the materials sought fall within one of the nine enumerated statutory exemptions; the FBI, however, claimed no exemption as to the three duplicative pages. Pl.'s Mem. at 20-21 (citing *Milner v. U.S. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (holding that FOIA exemptions are "explicitly made exclusive") (citation omitted)).

But Defendant's reading of FOIA is far too constrained.   The purpose of FOIA is satisfied when an agency produces the requested pages.  *See Crooker v. U.S. State Dep't*, 628 F.2d 9, 10–11 (D.C. Cir. 1980) (declining to require one agency to produce copies of the same records already produced by another agency because FOIA's purpose of providing access to government materials had already been satisfied).   The statute is not a discovery tool that requires agencies to produce every conceivable copy in the possession of every governmental custodian.  *See id.* at 10 ("Once the records are produced the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made.").   Consequently, though "records may not be withheld simply because a similar, draft, or annotated version was produced by another part of the agency, it would be illogical and wasteful to require an agency to produce multiple copies of the exact same document." *Defenders of Wildlife v. U.S. Dep't of the Interior*, 314 F. Supp. 2d 1, 10 (D.D.C. 2004).   Therefore, the court grants Defendant's motion and denies Plaintiff's motion with respect to Jett's claim regarding the duplicate records.

C.      **Adequacy of the Search**

The final issue before the court is whether the FBI conducted an adequate search. To win

at the summary judgment stage, "the agency must show that it made a good faith effort to conduct

a search for the requested records, using methods which can be reasonably expected to produce

the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

To carry its burden, the agency may submit "[a] reasonably detailed affidavit, setting forth the

search terms and the type of search performed, and averring that all files likely to contain

responsive materials (if such records exist) were searched." *Id.* "[T]he issue to be resolved is not

whether there might exist any other documents possibly responsive to the request, but rather

whether the *search* for those documents was *adequate*." *Weisberg v. DOJ*, 745 F.2d 1476, 1485

(D.C. Cir. 1984) (citation omitted). "The adequacy of the search, in turn, is judged by a standard

of reasonableness and depends, not surprisingly, upon the facts of each case." *Id.* (citation

omitted).

According to the Hardy Declaration, the FBI searched for records as follows:

> [T]he FBI narrowed its search to any records dealing with the FBI Jacksonville
> Field Office's investigation into plaintiff's allegations of bribery, during the 2012
> Florida congressional race, since these were requested by plaintiff. An FBI FOIA
> analyst conducted a search of the CRS, through ACS, utilizing a three-way phonetic
> breakdown of James B. Jett, to include the variation of 'James Jett.'

Hardy Decl. ¶ 22. The CRS contains "administrative, applicant, criminal, personnel, and other

files compiled for law enforcement purposes," which are broken down according to subject matter.

*Id.* ¶ 16. To search the CRS, the FBI uses the Automated Case Support System ("ACS"), which

"can be described as an internal computerized subsystem of the CRS." *Id.* ¶ 17. Data from the

CRS can be retrieved by searching the ACS General Indices. *Id.* ¶ 18. Plaintiff contends that the

FBI's search was deficient in two respects.

*1.      Plaintiff's Argument that the FBI's Search Terms Were Inadequate*

First, Plaintiff argues that the FBI's use of only variants of his name as search terms was not reasonably calculated to locate all responsive records. He contends that the FBI also should have used as search terms the names of his Opponent, the Intermediaries, and the high-ranking Member of the House—he specifically had identified each of them in his request. Pl.'s Mem. at 8-9. Defendant counters that "Plaintiff cannot question the adequacy of the search regarding the third parties" because he never provided the FBI with a Privacy Act waiver from any of the third parties or with proof of their death. Def.'s Reply, ECF No. 13, at 3.

Jett's failure to produce a Privacy Act waiver did not, in this case, justify the FBI's refusal to *search* for documents by running the names of other pertinent players through the CRS database. Whether such searches would return *producible* documents is a separate question. The Privacy Act provides that records held by an agency may not be disclosed "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be . . . (2) required under section 552 of this title." 5 U.S.C. § 552a(b). "In other words, the Privacy Act prohibits the FBI from disclosing information about a living third party without a written privacy waiver, *unless* FOIA requires disclosure." *Burke v. DOJ*, No. 96-1739 (RMU), 1999 WL 1032814, at *3 (D.D.C. Sept. 30, 1999). Thus, in deciding whether the FBI's categorical refusal to run names other than Jett's in CRS was warranted, the question is not whether Jett obtained third-party waivers, but rather whether *all* responsive documents resulting from such searches would be exempt from disclosure under FOIA. *See Blackwell v. FBI*, 646 F.3d at 42 ("Because a search for records 'pertaining to' specific

individuals would have added only information that we have concluded is protected by Exemption 7(C), it follows that the FBI was correct in declining to search for such documents.").[4]

Two cases compel the conclusion that it was unreasonable for the FBI to categorically refuse to search for materials in CRS using names other than Jett's as search terms. The first case is *Reporters Committee*. There, the Supreme Court held that, when balancing the interests for and against disclosure under Exemption 7(C), "categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." 489 U.S. at 776. In striking that balance, the Court wrote, courts must be mindful that "FOIA's central purpose is to ensure that the *Government's* activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed." *Id.* at 774.

The second case is *CREW*. *CREW* teaches that, at least with respect to records of a public corruption investigation, the public-private interest balance ordinarily will *not* characteristically tip in favor of non-disclosure. Thus, categorical withholding is generally improper in such cases. As discussed, *supra*, in *CREW*, the Court of Appeals held that it was improper for DOJ to categorically withhold all documents relating to the public corruption investigation of former House Majority Leader Tom DeLay. *See* 746 F.3d at 1095-96. Although the Court of Appeals found that DeLay's personal privacy interests were "not insubstantial," *id.* at 1092, it concluded that there was "a weighty public interest in shining a light on the FBI's investigation of major political corruption and the DOJ's ultimate decision not to prosecute a prominent member of the Congress for any involvement he may have had," *id.* at 1092-93. The disclosure of documents,

---

[4] The FBI does not cite *Blackwell*; nor does it argue that its categorical refusal to search was justified because all responsive records would be exempt from disclosure. Although the agency does not make that argument, the court addresses it because that is the proper inquiry under controlling precedent.

the Court wrote, "may show whether prominent and influential public officials are subjected to the same investigative scrutiny and prosecutorial zeal as local aldermen and little-known lobbyists." *Id.* at 1094. Accordingly, the Court declined to "accept the DOJ's contention that there is *no* public interest in examining the FBI's investigation of, and the DOJ's decision not to charge, the former House Majority Leader[.]" *Id.*

Just as in *CREW*, where DOJ could not categorically withhold all pertinent records because the balance did not characteristically tip in favor of non-disclosure, the FBI here could not categorically decline to run searches using the names of those people identified by Jett as being involved in the public corruption investigation. Although those persons have compelling personal privacy interests, the public interest here is "weighty." *Id.* at 1092. True, this case may not match the notoriety of the Abramoff scandal and Jett's Opponent may not be as prominent as Tom DeLay. *See id.* at 1095 ("We endorsed a 'case-by-case balancing' approach that considers 'the rank of the public official involved and the seriousness of the misconduct alleged.'" (quoting *Kimberlin*, 139 F.3d at 949)). But the public surely has an interest here in knowing how the FBI and DOJ conducted a public investigation involving an elected federal official and—especially in light of Jett's public accusation that the investigation ended prematurely to protect the high-ranking House Member—why they ultimately decided not to pursue it further. *See* Pl.'s Mem., Ex. D. Simply put, like *CREW* but unlike *Blackwell*, this is not a case in which the public-private balance "characteristically tips in one direction" and thus would warrant a refusal to search based on the failure to obtain a Privacy Act waiver. *Reporters Committee*, 489 U.S. at 776. The FBI therefore will be required to search for files in CRS using the names of the persons identified in Jett's FOIA request.

None of this is to say that the documents that such a search generates, if any, must be produced in their entirety. As the court already has held, duplicate records need not be produced. And, "the names and identifying information of third parties contained in investigative files are presumptively exempt." *CREW*, 746 F.3d at 1096. Other FOIA exemptions may apply as well. The FBI cannot in this case, however, invoke the Privacy Act to justify a blanket refusal to use relevant names as search terms to locate documents responsive to Jett's request.

        2.    *Plaintiff's Argument that the FBI Should Have Searched the ELSUR Database*

Plaintiff further claims that, in addition to searching CRS, Defendant should have searched the Electronic Surveillance Indices ("ELSUR") database, a record-keeping system separate from CRS that the FBI uses to hold records pertaining to the agency's use of electronic or telephonic recordings that cannot be searched via the CRS database. Pl.'s Mem. at 8-9. As the FBI's affiant here, David Hardy, acknowledged in a declaration filed in another case, any responsive records within the ELSUR database would not be captured by a search of the CRS database. *See Shapiro v. DOJ*, 37 F. Supp. 3d 7, 21 (D.D.C. 2014) ("ELSUR indices also are automated, but constitute a separate system of records from CRS and cannot be retrieved through either the General Index or CRS."). According to Plaintiff, Defendant was on notice, "based upon its review of the responsive records that it located via its CRS database search, that the subject matter of this FOIA request involved several consensual interception[s] of telephonic voice recordings, which therefore required [an] additional search for records in the FBI's ELSUR record system." Pl.'s Mem. at 9. Upon learning of the existence of telephonic voice recordings, according to Plaintiff, the FBI "had a clear duty, as a component of its adequacy of search responsibilities, to follow-up on this lead, and search for any additional responsive records" within the ELSUR system. *Id.* (citing cases).

But this is not a case in which the court need decide whether the agency should have expanded its search when its initial findings pointed to another records system. Here, the need to search the ELSUR system was plain on the face of Jett's FOIA request. Jett specifically asked for "copies of telephonic tape recordings made from my personal telephone at the request of the FBI." Def.'s Mot. for Summ. J, Ex. A., at 25. Thus, from the outset, ELSUR was an obvious source of responsive information that the FBI was required to search. *See Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999) ("It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden."); *Oglesby*, 920 F.2d at 68 (stating that an "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested").

The FBI contends that it is "disingenuous" for Plaintiff to complain that it searched only CRS, because "Plaintiff's very own FOIA request indicated that the CRS system should be searched." Def.'s Reply at 3. Jett did ask the FBI specifically to search CRS. Def.'s Mot. for Summ. J, Ex. A ("Please search the FBI's indices to the [CRS] for the information responsive to this request . . . ."). But Jett's request cannot reasonably be read to have asked the FBI to search *only* the CRS database. Indeed, when his request sought information that plainly was not contained within CRS, *i.e.*, recorded telephone conversations, the FBI could not put its head in the sand and ignore an obvious source for the requested material. Because the FBI neglected to search the ELSUR system, it has failed to carry its burden to "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Motion for Summary Judgment is granted in part and denied in part.

On or before October 30, 2015, the FBI shall submit a status report that sets forth its compliance with this Memorandum Opinion and Order.

Dated:  September 30, 2015

Amit P. Mehta
United States District Judge